AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

1650 S. Muskego Avenue, Milwaukee, WI

Case No. 17M029

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B & Attachment C

The basis for the search under Fed. R. Crim P. 41(c) is:
- ■ evidence of a crime;
- ■ contraband, fruits of crime, or other items illegally possessed;
- ■ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841(a)(1) and 846,
Title 18, United States Code, Section 1956(a)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Applicant's signature_

Special Agent Jeffrey Hale, DEA
_Printed Name and Title_

Sworn to before me and signed in my presence:

Date: March 16, 2017

_Judge's signature_

City and State: Milwaukee, Wisconsin

Honorable David E. Jones, U.S. Magistrate Judge
_Printed Name and Title_

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Jeffrey J. Hale, being duly sworn, depose and states as follows:

## I. TRAINING AND BACKGROUND

1. I am a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation (DCI), Narcotics Bureau, and a state certified law enforcement officer currently assigned to the Milwaukee Field office. I am federally deputized by the United States Department of Justice, Drug Enforcement Administration ("DEA"). I have worked as a full time law enforcement officer with DCI since October 1999. Prior to my assignment with DCI, I was a Police Officer with the Milwaukee Police Department for approximately 4 years. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. Based on my training, experience and participation in drug trafficking investigations and associated financial investigations involving large amounts of cocaine, crack cocaine, heroin and/or other controlled substances, I know and have observed the following:

   a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

   b. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

   c. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

   d. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

e. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control;

f. I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, and receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

g. It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

h. It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

i. Likewise, it is common for businesses who engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or placing the transaction in a nominee name. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment.

j. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cellphones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

l. I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

m. I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; and

n. I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those informant numbers or email addresses by the owner of the devices;

o. Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently

called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

2. Throughout this affidavit, I rely on the records of the Wisconsin Department of Transportation (WDOT), since they are official records, kept in the ordinary course of business, which are updated on a regular basis. I also rely on the records of Wisconsin Energies (WE) since they are business records maintained for billing purposes, kept in the ordinary course of business, and are updated on a regular basis.

3. This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation. This affidavit is also based upon information gained from interviews with cooperating citizen witnesses, informants, and defendants, whose reliability is established separately herein.

4. The investigation to date has included traditional law enforcement methods, including, but not limited to: confidential informants, information from other law enforcement officers; documentary evidence; physical surveillance; telephone records; electronic surveillance; and physical seizures. However, because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrants.

5. Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases controlled

substances from a target. The operation is conducted using surveillance, usually audio and video recording equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased controlled substances and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

6. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

## II. LOCATION TO BE SEARCHED

7. This affidavit is submitted in support of applications for a search warrant to seek evidence of conspiracy to distribute heroin, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and knowingly and intentionally concealing drug proceeds, in violation of Title 18, United States Code, Section 1956(a), for the below-listed locations associated with suspects who have committed, are committing, and will continue to commit the above-listed offenses.

**1650 S. Muskego Avenue, Milwaukee, WI** – The house is described as a two story single-family residence, with yellow siding, white trim and a black shingled roof. The front screen door is white in color and faces west with a small front porch and the numbers 1650 are affixed to a white pillar on the front porch. In addition, a 6-foot high wooden fence runs north and south from the southeast corner of 1650 S. Muskego Avenue to the next residence to the south. This fence separates the side yard from the rear yard and back door of 1650 S. Muskego Avenue.

## III. PROBABLE CAUSE

*Case Background*

8. This investigation was initiated in September 2016. To date, case agents have determined that a group of individuals, both known and unknown, are involved in a drug trafficking organization that case agents refer to as the "Rodriguez Drug Trafficking Organization" (DTO). This DTO cultivates, transports, and distributes heroin and other controlled substances in and around the area of Milwaukee, Wisconsin.

*Information Provided by the Confidential Informant*

9. In September of 2016, I interviewed a confidential informant (herein referred to as "CI") who stated that an individual known to the CI by the nickname of "PD" was an ounce-level heroin and cocaine trafficker. The CI purchased heroin from PD approximately thirty times over the last two years.

10. The CI stated that PD utilized several different cellphone numbers. The CI stated that PD did not drive, did not have a vehicle, and mostly obtained rides with other people when PD needed to go somewhere.

11. On September 18, 2016, PD contacted the CI from cellphone number 414-316-0148 because PD wanted the CI to drive him to an unknown residence to "grab something". The CI suspected that this meant PD was going to pick up heroin or cocaine. The CI picked up PD around 3:30pm in the area of S. 13th Street and W. Lapham Street, Milwaukee, WI, and the CI drove PD to an area on the north side of Milwaukee. PD got out of the CI's vehicle, and spoke to the driver of another vehicle. After speaking with the other driver, PD came back to the CI's vehicle with a large chunk of heroin, which the CI estimated to be approximately two ounces of heroin. The CI then drove PD back to the area of S. 13th Street and W. Lapham Street in Milwaukee where the

CI dropped off PD. The CI then called case agents to relay the information that the CI had obtained.

12. In early November 2016, the CI pointed out to case agents the residence of 2426 W. Mineral Street, which is the upper unit of a duplex located at 2426/2428 W. Mineral Street, Milwaukee, WI. The CI stated that this residence was used by PD for PD's drug trafficking operations.

13. Also in early November 2016, case agents requested the CI to attempt to identify where PD resided. The CI contacted case agents within a couple of days and stated that the CI had identified PD's residence as 1650 S. Muskego Avenue, Milwaukee, WI.

14. The CI contacted case agents and stated that on November 17, 2016 the CI was at 1650 S. Muskego Avenue to set up a controlled buy of heroin. While at PD's residence located at 1650 S. Muskego Avenue, the CI observed PD's Wisconsin driver's license inside of the residence. The CI was able to identify PD as Luis Rodriguez.

15. While present at the residence, PD informed the CI that PD's brother (who was known to the CI by the nickname of "D") was on probation or parole with the State of Wisconsin. PD told the CI that D had a home visit scheduled with his probation officer the morning of November 18, 2016 at 1650 S. Muskego Avenue. PD told the CI that he was upset that D was using 1650 S. Muskego Avenue for his probation residence. PD told the CI that D actually lived at 2426 W. Mineral Street.

16. On November 18, 2016, the CI conducted a controlled buy of a half-ounce quantity of heroin from PD and D. The CI contacted PD through the cellphone number 414-881-9606 and arranged the purchase of a half-ounce of heroin for $1,600. PD instructed the CI to go to the 2400 block of W. Mineral Street. After the CI arrived, surveillance agents observed a gray Honda

bearing Wisconsin Registration Plates 330-YPM arrive and park near 2426 W. Mineral Street. Two Hispanic males, one in the driver's seat and one in the front passenger seat occupied the Honda.

17. Surveillance agents observed a Hispanic male (the CI identified this person as "D") exit the driver's seat of the Honda and enter the door leading to 2426 W. Mineral Street. D was inside of 2426 W. Mineral Street for approximately two minutes and was observed by surveillance agents exiting 2426 W. Mineral Street. D returned back to the driver's seat of the gray Honda and entered the vehicle.

18. Surveillance agents observed the gray Honda travel eastbound on W. Mineral Street towards the CI. D then motioned with his hand for the CI to follow the Honda. The CI followed the gray Honda to the 1200 block of S. 24th Street, where both vehicles pulled over to the side of the road. Surveillance agents then observed PD exit the gray Honda's front passenger door and enter the front passenger door of the CI's vehicle. PD was in the CI's vehicle for approximately two minutes, and while in the CI's vehicle, PD provided the CI with approximately 11.6 grams of heroin for a price of $1600. After the transaction, PD exited the CI's vehicle and got back into the front passenger door of the gray Honda. The Honda then left the area and surveillance was terminated.

19. After the transaction, case agents spoke with the CI, who stated that PD was the passenger of the Honda and D was driving the Honda. The CI stated he believed that D lived at 2426 W. Mineral Street. PD told the CI that PD had to charge more for the heroin on this transaction because PD had to obtain the heroin from PD's brother, D.

20. After the heroin transaction on November 18, 2016, case agents made contact with the Wisconsin Department of Corrections (WIDOC) regarding the address of 1650 S. Muskego

Avenue, and inquired if anyone on active supervision was utilizing that address. WIDOC records showed that Luis D. Rodriguez, H/M, DOB: 10/03/1983 (AKA "D") listed 1650 S. Muskego Avenue as his home address with WIDOC. WIDOC further stated that D was on active parole supervision for Battery to a Law Enforcement officer. D was scheduled for a home visit on November 18, 2016, which confirmed information that the CI had told case agents.

21. In early December 2016, the CI contacted case agents and stated that the CI learned that PD was arrested in Milwaukee County earlier in the fall of 2016. Case agents contacted the Milwaukee County Jail records, and discovered that Luis M. Rodriguez, H/M, DOB: 03/19/1993 (AKA Luis P. Rodriguez, AKA "PD") was arrested on August 3, 2016 for Carrying a Concealed Weapon and Possession with Intent to Distribute Cocaine.

22. On December 12, 2016, case agents again met with the CI. The CI stated that on December 11, 2016, the CI picked up PD from 1650 S. Muskego Avenue and drove PD to a location on the north side of Milwaukee where PD met the same heroin supplier as PD met on September 18, 2016. The CI was present on at least five occasions during the last year where PD purchased heroin from the same supplier, and on three of these occasions, the CI was able to observe money exchanged for the heroin.

23. On December 14, 2016, the CI conducted another controlled buy of a half-ounce quantity of heroin from PD and D. The CI placed a recorded phone call to PD at 414-391-6854 and confirmed the price of the heroin to be $1400. PD requested the CI come to 1650 S. Muskego Avenue to pick up PD. The CI drove to 1650 S. Muskego Avenue, where surveillance agents observed the CI park and walk towards the rear door at 1650 S. Muskego Avenue. The CI contacted case agents and stated that the plan had changed upon the CI's arrival. The CI was inside of 1650 S. Muskego Avenue with PD and D, and that the transaction was going to occur inside of

the residence. The CI stated that PD and D had in excess of a one-ounce quantity of heroin in the residence, so there was no need to meet with the supplier.

24.     Case agents spoke with the CI after the transaction, and the CI stated that PD opened the door to 1650 S. Muskego Avenue for the CI upon the CI's arrival. PD escorted the CI to a second floor bedroom where D was sitting at a table cutting, packaging, and weighing different quantities of heroin. The CI entered the room D was in, and PD went to another room. PD returned a short time later with an additional quantity of heroin, which the CI believed to be in excess of a one-ounce quantity of heroin. PD then sat at the table with D and began breaking apart his chunk of heroin. PD weighed and packaged several bags of heroin and gave them to D. The CI stated that the bags appeared to be packaged in half-gram or one-gram quantities. The CI also observed a few three-gram quantity bags of heroin. PD was also packaging the half-ounce quantity of heroin for the CI during this time. While in the residence, the CI overheard PD taking several telephone calls, which the CI believed were consistent with customers calling for heroin. PD then took the money from the CI and gave the CI a plastic sandwich bag containing approximately 12.4 grams of heroin. During this transaction, video footage was obtained of both PD and D sitting at the table.

25.     On January 26, 2017, the CI conducted another controlled buy of a half-ounce quantity of heroin from PD. The CI had a new cellphone number for PD of 414-888-3248, which the CI believed PD was borrowing from another person. The CI made a recorded telephone call to PD who agreed to take the CI to meet the supplier to obtain the half-ounce of heroin. The CI arrived at 1650 S. Muskego Avenue and parked in front of the residence. The CI exited the CI's vehicle, and walked up to the rear door at 1650 S. Muskego Avenue. Approximately 2 minutes later, surveillance agents observed the CI and PD enter the CI's vehicle. The CI and PD drove

around to several different areas in Milwaukee looking for the heroin supplier. PD was unable to locate the supplier, so the CI drove PD to 2426 W. Mineral Street. PD and the CI entered 2426 W. Mineral Street. The CI and PD were inside of 2426 W. Mineral Street for approximately two hours, during which time surveillance agents observed several vehicles coming and going from the residence. PD was observed exiting 2426 W. Mineral Street and meeting with several vehicles for very short-term contacts. Based on training and experience, PD appeared to be conducting numerous drug transactions with the occupants of the observed vehicles.

26. Case agents spoke with the CI after the transaction, and the CI stated that while inside of the residence at 2426 W. Mineral Street, PD was waiting on the heroin supplier to show up with the quantity of heroin. Present inside of the residence with the CI and PD were three children and two adult females, as well as an unknown Hispanic male, who also went by the nickname of "D" and will be referred to as "Unknown D" for purposes of this affidavit. PD told the CI that PD had two brothers, D and Unknown D.

27. Once inside of 2426 W. Mineral Street, the CI observed a six-ton kilogram press used to package kilograms of drugs in the kitchen of the residence. The CI took a covert photograph of this press and case agents observed and identified the machine (Attachment C). The CI observed that Unknown D and PD sat at the kitchen table with three separate piles: the first pile contained ounces of heroin; the second pile contained a half-ounce of crack cocaine; and the third pile contained a cutting agent for the heroin. The CI also observed a scale for weighing drugs and sandwich bags for packaging drugs. The CI observed Unknown D and PD mixing the cutting agent with the heroin and packaging the drugs. The CI met Unknown D on approximately fifteen different occasions, but the CI did not know Unknown D's name. After the CI provided PD with the money, PD provided the CI with approximately 10.8 grams of heroin. The CI then drove PD

back to PD's residence at 1650 S. Muskego Avenue, where surveillance agents observed PD enter the front door at 1650 S. Muskego Avenue.

28. On February 7, 2017, the CI conducted a controlled buy of heroin from PD. During this transaction, the CI purchased a one-ounce quantity of heroin for $2,750. The CI picked up PD in the area of 2400 W. Pierce Street and the CI drove back to the CI's residence. PD received a cellphone call and was instructed by the heroin supplier to drive to the area of S. 5th Street and W. Harrison Street. The CI drove PD to that location, and once at that location, PD and the CI met with a vehicle occupied by a Hispanic male. The unidentified Hispanic male provided approximately two ounces of heroin and a half-ounce of crack cocaine to PD. The Hispanic male then drove PD and the CI to the CI's house. While driving there, the CI gave PD the money for the heroin. After the CI and PD were dropped off at the CI's house, PD entered the CI's residence and began cutting and packaging the heroin. PD then gave the CI the ounce quantity of heroin, and kept the remaining heroin and cocaine for himself. The CI and PD left the CI's residence on foot, and a vehicle was observed picking up PD a short walk from the CI's residence. The vehicle drove to 1650 S. Muskego Avenue and parked. The driver and PD exited the vehicle and entered 1650 S. Muskego Avenue. The CI met with case agents, and provided the one-ounce quantity of heroin to case agents.

29. The CI was shown a photograph of Luis P. Rodriguez, H/M, DOB: 3/19/1993, and identified this person as the individual the CI knew by the nickname of "PD". The CI was then shown a photograph of Luis D. Rodriguez, DOB: 10/03/1983 and identified this person as the individual the CI knew by the nickname of "D".

30. The CI estimated conducting a minimum of thirty heroin transactions with PD over the last two years normally purchasing a half to one-gram quantities of heroin on each occasion.

The CI first purchased heroin from D on November 18, 2016. Prior to that transaction, the CI had only obtained heroin from PD. The CI knew that D was a heroin trafficker but was unsure if PD and D dealt together on a regular basis.

31. Case agents believe the information provided by the CI to be truthful and reliable because the CI has provided information regarding drug trafficking activities in the Southeast Wisconsin area, as well as other areas in the United States, which case agents have been able to verify through independent investigation. The CI has also made statements against the CI's own penal interests. The CI has no criminal charges pending in State or Federal court. The CI was cooperating with law enforcement in order to be a good citizen and was rewarded financially for conducting the controlled buys. The CI did not receive any payment for information provided to law enforcement but was paid for conducting controlled buys. Lastly, case agents were able to verify the CI's information regarding the controlled buys through video/audio recordings. Case agents independently corroborated the CI's information. The CI's information is mostly based on personal observations. The CI has provided significant detail regarding criminal activity, and there is not significant time between the CI's information and the application for this search warrant.

32. Case agents conducted a criminal history check on Luis P. Rodriguez, AKA Luis M. Rodriguez, AKA PD. Case agents learned that on 08/04/2016, a criminal complaint (Milwaukee County case 2016CF003440) was filed against Luis M. Rodriguez, H/M, 03/19/1983, (AKA Luis P. Rodriguez, AKA PD) charging PD with Possession With Intent To Deliver Cocaine, less than or equal to one gram, and Carrying a Concealed Weapon. A bench warrant was issued for PD on 09/01/2016. As of today's date, this case is still open and a bench warrant for PD has been issued. PD has no other criminal history.

33. Case agents conducted a criminal history check on Luis D. Rodriguez, H/M, DOB:

10/03/1983, (AKA D) and learned that D was convicted of the following felonies: Manufacture/Deliver Cocaine less than five grams in 2001 (Milwaukee County case 2001CF002705); Prisoner Throw/Expel Bodily Substances in 2003 (Milwaukee County case 2003CF005976); Manufacture/Deliver Cocaine, one to five grams and Possession with Intent to Deliver Cocaine, five to fifteen grams in 2007 (Milwaukee County case 2007CF000458); and Battery to a Law Enforcement Officer in 2014 (Milwaukee County case 2014CF002737). D also had a lengthy criminal history to include arrests for Loitering, Disorderly Conduct, Criminal Damage to Property, and Battery.

34. On March 7, 2017, case agents queried Wisconsin Department of Transportation (WIDOT) records for PD and D. Case agents learned that PD listed his address with WIDOT as 1650 S. Muskego Avenue, and D listed an address in New Lisbon, WI.

35. On March 7, 2017, case agents again made contact with the Wisconsin Department of Corrections (WIDOC) regarding the Luis D. Rodriguez, H/M, DOB: 10/03/1983 (AKA D). According to WIDOC records, D still listed 1650 S. Muskego Avenue as his home address. D is on active supervision with WIDOC until July 2018. As one of the conditions of parole, D was to have no contact with Lizbeth Estrada.

36. On March 7, 2017, case agents conducted a check with WE Energies regarding 1650 S. Muskego Avenue and 2426 W. Mineral Street. For 1650 S. Muskego Avenue, the utility subscriber was listed as Pedro Rodriguez, and listed the residence as a single family. For 2426 W. Mineral Street, WE Energies records show the utility subscriber as Lizbeth Estrada, and the unit was listed as the upper unit of a duplex.

## IV. CONCLUSION

Based on the facts contained within this affidavit, case agents believe PD and D are multiple ounce heroin traffickers. PD is believed to be a multiple ounce heroin dealer for at least two years. Case agents believe that PD has obtained multiple ounce quantities of heroin for distribution in the Eastern District of Wisconsin beginning in the fall of 2014 until the present date. Case agents believe that located within the above-described location, there is evidence of drug distribution activities between PD, D, and others who are yet unknown in this investigation. Case agents further believe that located within the location is evidence pertaining to the fruits, instrumentalities, and proceeds of drug trafficking, and the laundering of the proceeds from drug trafficking, all of which are detailed more specifically in Attachment B, items to be seized.

## ATTACHMENT A

**PROPERTY TO BE SEARCHED:**

**1650 S. Muskego Avenue, Milwaukee, WI** – The house is described as a two story single-family residence, with yellow siding, white trim and a black shingled roof. The front screen door is white in color and faces west with a small front porch and the numbers 1650 are affixed to a white pillar on the front porch. In addition, a 6-foot high wooden fence runs north and south from the southeast corner of 1650 S. Muskego Avenue to the next residence to the south. This fence separates the side yard from the rear yard and back door of 1650 S. Muskego Avenue.

## ATTACHMENT B

**ITEMS TO BE SEIZED:**

1. Any illegal drugs or controlled substances, paraphernalia associated with controlled substances including scales and other weighing devices as well as packaging materials and containers used to package controlled substances;

2. Proceeds of drug trafficking activities, including United States currency

3. All bank records, checks, credit card bills, account information, and other financial records; Financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

4. Lists of drug customers and related identifying information;

5. Personal address books, telephone bills, photographs, letters, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

6. Documents and deeds reflecting the purchase or lease of items obtained with the proceeds from drug trafficking activities;

7. Records of off-site locations to store proceeds and other records, including safes, vaults, or lock boxes, safe deposit box keys, records and receipts and rental agreements for storage facilities;

8. Records of mail and communications services, cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/or data.

9. Indicia of occupancy, residency or ownership of the premises, including utility bills, telephone bills, loan payment receipts, addressed envelopes, escrow documents and keys.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## ATTACHMENT C

